**GREENE COUNTY, Missouri, Respondent,**

**v.**

**HERMEL, INC., a corporation, Appellant.**

No. 58141.

Supreme Court of Missouri,
Division No. 2.

July 22, 1974.

Dee Wampler, Springfield, for plaintiff-respondent Greene County, Missouri.

White, Dickey & Allemann, Turner White, Springfield, for defendant-appellant.

C. Wallace Walter, Kenneth T. Walter, Mann, Walter, Burkart & Weathers, Springfield, for The School District of Springfield R–12.

HENRY I. EAGER, Special Commissioner.

■ This case involves the valuation for 1971 state and county taxes of the "Battle-field Mall" in Springfield, Missouri, owned by Hermel, Inc. It consists of about 60 acres of land and a building approximately 1400 feet long containing 40–50 stores, and an enclosed mall. The case is here on appeal from an order of the Circuit Court reversing a decision of the State Tax Commission. The mall was opened for business in July 1970. The assessor placed a valuation of $1,441,612 on the land as of January 1, 1971, which resulted in an assessment value of $432,480. Appellant raises no objection to that valuation. The improvements as a whole were valued by the assessor at $11,744,909, leaving an assessed value for taxation of $3,557,660. On these valuations the total taxes would be $254,368.22 a year. We shall refer to the appellant as Hermel. At the hearing before the Tax Commission Hermel's Vice-President testified that the construction cost was $8,362,884, including certain allowances to tenants for completion of their store interiors. On the improvements, Hermel's expert witness testified to valuations of: (1) the construction cost, as above, less the cost of land preparation, leaving $8,012,108.25; (2) the capitalization of income,—$8,472,691; and (3) the "market data" approach based on comparable sales,—$8,590,000. The representatives of the county testified to their original assessed valuations as stated above. The Tax Commission adopted the unopposed land valuation, and fixed the value of the improvements at $9,000,000, with a tax valuation of $2,700,000. We shall review the testimony and its findings later. The county filed a petition for review (and later a first and second amended petition) in which it alleged: that the decision was not supported by competent and substantial evidence, that it was arbitrary, capricious and unreasonable, and that it was in violation of § 536.140, RSMo1969, V.A.M.S.[1] The petition sought an order assessing the taxable value of the improvements at $3,523,480. (Some of these figures vary slightly as they appear in different places,

---

1. All statutory references will refer to that revision.

but this is immaterial to our ultimate consideration.) The Circuit Court found and concluded that the decision of the Tax Commission was arbitrary and not supported by competent and substantial evidence, and set it aside; furthermore, it remanded the matter to the Commission with directions to enter an order reinstating the assessment of the Greene County assessor. From that order and judgment Hermel has appealed. We have jurisdiction of the appeal because our cases have held that similar appeals involved the construction of our revenue laws. Drey v. State Tax Commission, 345 S.W.2d 228 (Mo.1961); State ex rel. Kahler v. State Tax Commission, 393 S.W.2d 460 (Mo.1965); Koplar v. State Tax Commission, 321 S.W.2d 686 (Mo.1959). The School District of Springfield, R–12, has appeared here by counsel as amicus curiae, both by brief and in oral argument.

Before we reach the merits we must note Hermel's motion to dismiss the petition for review. The Circuit Court overruled the motion without comment, but the point is briefed here on appeal. The decision of the Tax Commission was rendered on December 3, 1971; it seems to be conceded that the County filed a petition for review within 30 days thereafter, although the record does not show the precise date. The transcript of the proceedings before the Commission was not filed with the Circuit Clerk until May 23, 1972. There was no formal extension of time. Hermel insists that the failure to file the transcript within 30 days after the filing of the petition for review, as required by § 536.130 and Rule 100.06, V.A.M.R., deprived the Circuit Court of jurisdiction; both the statute and rule require the filing within 30 days, "or within such further time as the court may allow * * *." On December 28, 1971, the attorney for the County wrote the reporter, confirming earlier conversations, and asked that the transcript be prepared with "all deliberate speed." On February 23, 1972, the transcript was sent to the Tax Commission for its approval, with notice to Hermel's counsel. Section 536.130, subd. 2. It was not finally approved and filed by the Commission until on or about May 23, 1972. During this period the Commission prepared and added its findings of fact and conclusions of law. In the meantime the original Greene County Circuit Judge had been disqualified, the other two had disqualified themselves, and Judge H. A. Kelso had been designated as Special Judge to hear the matter. The parties had been in communication with him by correspondence regarding a date for the hearing on review, and counsel for Hermel expressly asked for a setting. Most of the delay here resulted from the time required by the reporter to complete the transcript and the delay of about three months by the Commission in approving and completing it. Both the Greene County Circuit Judge and Judge Kelso considered the pendency of the matter after the expiration of the thirty-day period and the judges and both parties knew that the transcript was in the process of preparation. This point was not raised until after the transcript had been filed.

■ Cases are cited pro and con on the necessity of enforcing procedural rules and the jurisdictional nature of such requirements and, on the contrary, to the effect that the courts should determine cases on the merits, if possible, especially where the party in default has attempted in good faith to comply. Both this court and the bar generally are reasonably familiar with these applicable principles and we do not intend to consume time and space in discussing the dozens of cases cited. The situation has some analogy to that covered in our Rule *81.04* fixing the ordinary time for appeal at ten days, but providing further that failure of the appellant to take the further steps required to secure review within the periods allowed "does not affect the validity of the appeal, but shall be ground for such action as the appellate court deems appropriate." It would have been comparatively simple here for respondent to procure an order of extension and

it should have done so. It did, however, order the transcript promptly, the Circuit Court more or less considered the matter as though an extension had been granted, and counsel for Hermel was kept advised of the steps being taken to procure and file the transcript. In view of the nature of the case, including the public interest, we feel that the parties should have a determination on the merits. The motion to dismiss is overruled.

As already indicated, we are considering here only the valuation to be placed upon the improvements. Mr. Elliott Freed, Hermel's Vice-President in charge of the construction, produced the final request of the general contractor for payment, with credits for previous payments, and testified that Hermel had paid those amounts. The total listed was $7,036,935.25, but to this Mr. Freed added the amount paid to another contractor and the sum of the amounts allowed and paid to tenants for the completion of their respective stores "in a normal manner," arriving at a grand total of $8,362,884. This figure, Mr. Freed said, represented the cost of the building. He also presented an exhibit which showed the cost as apportioned by the contractor to separate stores and sections of the building; this exhibit also showed, by way of comparison, the assessment figures (as received from the assessor) on the same stores and sections. The exhibit shows very substantial increases in the assessment of most of the units over their respective costs, but we are dealing here with the improvements as a whole. It is worthy of note, however, that the assessor arrived at his supposed replacement cost by computing it upon each separate unit, with no apparent relation to actual cost. Mr. Freed could not recall that he was ever asked by the assessor for figures on income or expenses; he testified that the annual net income from rents was approximately $1,390,000, with a provision in the leases for an additional percentage rental based on gross income as a "hedge" against inflation; no figure could be given on this latter item, since the stores had not been in operation for a full

year as of January 1, 1971. The amounts allowed and paid to the tenants for completion of their respective store interiors were negotiated with the tenants; Hermel did not claim any interest in any property produced by expenditures in excess of these allowances and did not even know what totals were spent. It takes depreciation only upon the amounts allowed and paid. Mr. Freed testified that, "to his knowledge" he was not asked by the assessor for the construction costs; he furnished all of the figures to Mr. Duck of B. W. Duck and Associates who was selected to make an appraisal of the property. This firm had never been used by Hermel previously; after inquiry, Mr. Freed determined that none of the Springfield appraisers had time to do the job for Hermel. The deed of trust on this property contained a provision that the loan should not be more than 75% of the value of the property; the actual loan was $10,125,000. Mr. Freed assumed that an appraisal had been made at the time of the loan, but testified that any then valuation was not his.

B. W. Duck of B. W. Duck and Associates of Indianapolis, Indiana, had been engaged in the business of real estate appraisals and management, and allied fields since 1933. He was a member of the American Institute of Real Estate Appraisers, and of various real estate organizations. He had spent a day in Springfield examining the property and making inquiries, had made various telephone calls for information thereafter, and had spent "weeks" in studying the matter and arriving at his computations. He testified: that there are three generally accepted approaches to the valuation of real estate, namely, the reproduction cost less depreciation plus the land value, the income capitalization approach, and the market data approach; that he had seen copies of various records of the assessor; that his computations on the different bases are shown in his report, which was received as an exhibit. He first showed, as the cost approach, a figure of $8,012,108.25 for the improvements after deducting $293,255 for

grading and site work which he considered as a land cost; he testified that, since the appraisal was made as of January 1, 1971, and the mall had not been opened until July of 1970, the property had suffered no "measurable depreciation"; he added a land value, but we are not concerned with that. He next considered the valuation from the income approach; he had examined the income figures in Hermel's office, but since the mall had not been open for a full year, it was necessary to make a projection of the rentals, including possible vacancies. He examined certain of the leases. He arrived at a net annual income figure of $1,394,550. Upon an assumed rate of interest, a consideration of the taxes, and a useful life of 25 years he found a capitalization value of $8,472,691 for the improvements. The third method, the market data approach, was said to be a consideration of the sales or offers for sale of comparable properties. Mr. Duck found no comparable property in the Springfield area and used for comparison properties in Minneapolis, Denver and West Virginia. From these comparisons, first, on a square foot basis, and, secondly, by a "gross rent multiplier" derived from one of the properties and applied to ours, he arrived at a valuation of $8,590,000 for the property involved, on the market data approach. Mr. Duck further testified that upon a consideration of all three approaches or methods, he gave most weight to the income approach, next to the cost approach, and least to the market data approach, arriving at a weighted average value of $9,512,000, including the land. This, of course, would leave a value of $8,100,400 on the improvements. It was Mr. Duck's opinion that "a shopping center today that is 25 years old is gone."

Two representatives of the assessor's office, Hugh Haseltine and Clyde Dusenberry, testified, collectively: that they had worked approximately a month in making this assessment; that they measured every store and each room, and prepared field notes and diagrams; that they arrived at a valuation of $11,744,909 on the improvements, using the replacement cost approach; that they did not have the income figures and that there were no other comparable properties in the area; that building costs had been rising all the time; that they did not "disbelieve" the evidence as to Hermel's overall costs, although they doubted that the hallways were built at the figure indicated; that in arriving at their replacement cost they used the "Kentucky Manual," a publication about ten years old, put out by the State of Kentucky, which consisted of a series of averages of costs; the assessment was based "partially" on this; that to the figures there shown they added 20% "on most items," and in some places more, using the manual as a base; that on some things they used "local costs"; that the Kentucky Manual does not fit any particular building, and there were no shopping centers when it was published; that the three recognized methods of valuation are the cost, market data and income approaches; that they utilized the cost approach and the result was simply their opinion; that at one time Mr. Freed and his counsel had given them a list of figures supposedly showing the construction costs, but that they did not use them.

Mr. Alva E. Koch, a Springfield real estate appraiser, testified for the County in substance: that he had reviewed the assessment and that the figure of $11,744,909 on the improvements represented about $17.50 per square foot of completed store area, excluding the hallways, and that this fell "within the range of construction of that type" as of January 1, 1971; that he had not examined or studied the property, having been contacted on "short notice"; that he heard Mr. Duck's testimony and felt that the capitalization rate which he used on income was high, and that the twenty-five-year life of the improvements was too low; that he did not make square foot comparisons of construction costs.

Two of the tenants of the mall testified (over objection) that they had spent substantial sums in excess of their respective allowances in completing and furnishing

the interiors of their stores; one had spent a total in excess of $100,000 as compared with an allowance of $24,000; he thought that his firm depreciated these costs. The other tenant received an allowance of $59,940 and spent approximately $180,000. Some of the expenses on these stores included carpentry, tile, steel, heating, air conditioning, plumbing, painting, plaster, sheet metal, vinyl and wiring; the second tenant also depreciated the excess expense. A copy of the lease to Hermel from the fee owners of the real estate was offered and received in evidence. It called for payments of $65,000 per year, and Hermel was to pay the taxes.

The Commission found that the overall construction cost to Hermel was, in accordance with its figures, $8,305,363.25 (a variation from $8,362,884), which included the allowances to tenants. It further found: that the basis of the assessment was the supposed replacement cost without consideration of the actual construction costs; it summarized much of the evidence, pro and con; it noted the valuations by Hermel's appraiser on the income approach ($8,372,691) and on the market data approach ($8,590,000). The exhibit demonstrating the different valuations was attached to the opinion of the Commission. The so-called findings consist largely of a recitation of the evidence.

In its "Conclusions of Law" the Commission adopted the agreed valuation of the land; as to the improvements, it concluded: that "true value in money" can only be an estimate; that the burden of overcoming the presumption in favor of the assessment was on Hermel, but that the Commission had authority to correct any assessment "shown to be unlawful, unfair, improper, arbitrary or capricious." The Commission was of the opinion that the actual construction costs, shown by undisputed evidence, "must be taken as a base from which true value is to be estimated," for the reason that the construction was so recent; it accepted Hermel's figures on costs as "accurate"; it noted that the assessor

made no reference to the actual costs, and noted again his method of separately measuring and valuing each individual unit and applying the Kentucky Manual figures, plus 20%, whereas it would have been more "sensible" to consider the project as a whole. It further concluded that the "replacement costs arrived at by Hermel's records" were more persuasive, but that the tenants had spent sums "considerably in excess of the allowances," and that Hermel's cost figures should be increased to reflect those expenditures. It therefore adopted a valuation of $9,000,000, as the "true value in money" of the improvements, and found that their assessment value was $2,700,000.

On petition for review the Circuit Court reversed the decision of the Commission and remanded the cause to the Commission *with directions* to enter an order reinstating the assessment of the County Assessor. It noted: that the evidence indicated that construction costs had been rising and that the costs should have been "adjusted *up*" to January 1, 1971; that Hermel had borrowed $10,125,000 on the property; that the assessor did not consider Hermel's actual costs; and that substantial values had been added in many instances by the excess expenditures of the store owners. The Court concluded: that the decision of the Commission was arbitrary, capricious and unreasonable and not supported by competent and substantial evidence; that there was not sufficient evidence for a determination of actual construction costs, since the figures were "self-serving and in large part hearsay," and because there was no evidence of the actual amounts spent by merchants in excess of their allowances; that other elements besides actual cost should have been considered, including the income factor with the over-ride percentage, the loan value of the property and the loan actually made, and the excess expenditures by tenants, as already noted; that there was no evidence upon which a valuation of $9,000,000 could have been arrived at, since it included a mere guess as to the excess expenditures of the tenants.

We have indulged in this painfully long recital of the facts and proceedings largely because we are required to determine whether the decision of the Commission was supported by competent and substantial evidence on the whole record, Section 536.140, and whether it was arbitrary and capricious. Hermel's contentions here essentially are: (1) that the Court erred in substituting its discretion for that of the Tax Commission; (2) that it erred in holding that there was no way in which the Commission could have determined the actual costs, since the uncontradicted testimony and exhibits reflected the actual costs and the assessor determined his value upon a cost basis; (3) that the Court erred in giving weight to the amounts expended by tenants because all such improvements were the property of the respective tenants, they were assessed as personal property and were claimed by them for purposes of depreciation. Respondent County and the School District of Springfield as amicus curiae contend: (1) that Hermel's evidence did not sustain its burden of proof; (2) that the decision of the Commission was arbitrary and capricious and unsupported by competent and substantial evidence in that: the figure of $9,000,000 bore no relation to the evidence; Hermel's evidence on costs was incomplete and was in part hearsay; Hermel's gross income figure was not accurate, its capitalization rate was unreasonable, and its "comparables" were not comparable; that the $10,125,000 borrowed by Hermel on the loan indicated a value far in excess of the figure found by the Commission; furthermore, that the Court did not err in directing that the assessment be reinstated, and that it did not err in giving weight (if it did) to the improvements made by the tenants because they properly constituted a part of the total improvements. Other matters are presented which go merely to the weight of the evidence, as indeed do some of the foregoing. We hold here that Mr. Freed's testimony re costs was not inadmissible as hearsay or as self-serving matter. He was the officer in charge of the construction for Hermel, and his evidence was not merely of figures submitted to him by others but of amounts which had been *paid,* to his personal knowledge. Incidentally, there was no objection whatever on this ground.

It is well established that a court, on review of an administrative decision, may not determine the weight of the evidence, or substitute its discretion for that of the administrative body; its function is to determine primarily whether the decision was supported by competent and substantial evidence upon the whole record, whether it was arbitrary, capricious or unreasonable, and whether the Commission abused its discretion. Section 536.140. Drey v. State Tax Commission, 345 S.W. 2d 228 (Mo.1961); In re St. Joseph Lead Company, 352 S.W.2d 656 (Mo.1961); Merritt v. State Hospital No. 1, Fulton, 403 S.W.2d 940 (Mo.App.1966); Cupples Hesse Corp. v. State Tax Commission, 329 S.W.2d 696 (Mo.1959); Stein v. State Tax Commission, 379 S.W.2d 495 (Mo.1964); Peck's Products Company v. Bannister, 362 S.W.2d 596 (Mo.1962); Koplar v. State Tax Commission, 321 S.W.2d 686 (Mo.1959). To the extent that the Circuit Court here directed the Commission to reinstate the assessor's valuation of $11,744,909 on the improvements we hold that it violated these principles and exceeded its authority. The evidence on valuations was highly controversial, and it may not be said that the assessor's valuation was correct as a matter of law. Counsel for respondent cite the case of Greyhound Lines, Inc. v. State Tax Commission, 441 S.W.2d 699 (Mo.1969), where the Court ordered a reinstatement of the original assessment. There the company had filed a return of personal property valued at $22,430, including no buses. The Commission raised this valuation to $350,000, supposedly based on buses located in Jackson County, but made no findings thereon. In reversing the case, the Court noted that there was *no evidence* to show that any buses were located in Jackson County and therefore no evidence

to contradict the presumably correct value of the property as listed in the return. There was *no issue* on that valuation. Therefore, as a matter of law, the Court might properly order its reinstatement. Here respondent did produce evidence of the valuation of its improvements, i. e.: (1) by actual costs paid by it; (2) on the capitalization of income; (3) on the theory of comparables; and finally (4) by Mr. Duck's final statement as an expert appraiser, that upon an averaging of methods, the fair market value of the improvements and land on January 1, 1971, was $9,512,000. Counsel's argument that appellant did not sustain its "burden" is really an argument on the weight of the evidence. Their argument, with citation of cases, that Hermel has shown no *discrimination*, is applicable when the property owner alleges and proceeds upon a theory of discrimination, as in Cupples, supra; Koplar, supra, and other cited cases. That is not appellant's theory here. Under Section 138.430, subd. 2 the Commission had the right to correct the assessment if it was found to be "unlawful, unfair, improper, arbitrary or capricious."

It remains for us to consider the Commission's decision on the merits. Since the decision was arrived at on a cost basis, there is no point in discussing at length the valuations advanced by Hermel on the capitalization of income basis or on the basis of comparable values. The Commission might have adopted the income approach had it seen fit, but we should not, on review, approve or condemn the decision on some theory which neither the Commission nor the respondent followed. Respondent has criticized Hermel's theories and evidence on those methods, but these become immaterial.

Essentially, the Commission adopted Hermel's evidence on total costs to it, finding the amount to be $8,305,363.25, Tr. 21 (a slight variation from the $8,362,884 shown on Pet.Ex.H. 2). As we understand its opinion: it disapproved of the County's method of fixing a valuation upon each separate store and adding these; it considered the supposed valuation which respondent says was indicated by the 75% provision of the deed of trust, but did not adopt it, as indeed it was not required to do; it certainly disapproved and disallowed respondent's figure of $11,744,909 as the replacement cost, both as to the opinions of the assessor's representatives and that of its expert, Mr. Koch; the decision as a whole fairly indicates a disapproval of the use of the "Kentucky Manual" plus a 20% added figure for replacement costs, unexplained and unverified as it was; it recognized that "true value" is at best an estimate; it held that the actual construction costs must be taken as a "base" for the true value, and it regarded those as reliable because the construction was so "recent," and the figures were "unchallenged." From this last holding it might well be assumed that the Commission was arriving at what it considered to be the *replacement* cost. This is further emphasized by its statement that the "replacement costs arrived at by Hermel's records is [sic] more impressive."

Some of these features become material in view of respondent's contention that "true value" may not be based upon the cost of construction, citing State ex rel. Platz v. State Tax Commission, 384 S.W. 2d 565 (Mo.1964) and State ex rel. Kahler v. State Tax Commission, 393 S.W.2d 460 (Mo.1965). In Platz, a residence was assessed at $15,000; the owner contended on review that the assessment was arbitrary and capricious in that it was based upon the supposed cost of construction. The assessment was upheld by the Commission, the Circuit Court and on appeal. It was noted that there was other evidence of value besides that of construction costs and that there was, therefore, competent and substantial evidence. The case is evidently cited here because the Court assumed, for the purposes of the opinion, that the assessment of a residence "based wholly on the single factor of the cost of construction would not stand the test of substantiality of evidence." This opinion left the

matter in some uncertainty. In Kahler, supra, a farm with a new home on it was assessed at $34,000, reduced by the County Board of Equalization to $28,800. It was shown that this figure was based upon the cost of the land and the supposed cost of construction of the house; the county's own witnesses admitted that the fair market value of the land and improvements was less than the total cost but stated that they used that method because they understood that the Tax Commission required it. The landowners' witnesses testified specifically to fair market values which (at 30%) would have reduced the assessment. The Commission did not indicate any disbelief of those witnesses, but ignored their testimony and adopted the assessment based on costs alone. This Court held that the decision of the Commission was not based upon competent and substantial evidence in that a computation based wholly upon the cost of the land and the cost of construction of the improvements did not constitute substantial evidence of fair market value, and that the assessment had no other substantial evidence to support it; also, that the only evidence of real value came from the petitioner, which evidence the Commission should not have ignored. The Court reversed, but refused to fix a valuation. In so doing it adopted and affirmed the assumption of law made in Platz, supra, re construction costs. We note that in Kahler the evidence specifically showed that the construction costs and fair market value were not the same. We shall revert to the Commission's use of the cost approach after discussing a feature upon which we find its decision to have been unreasonable and arbitrary.

■ After finding that the cost of construction was $8,305,363.25 and using this as a "basis" for its valuation, the Commission added a sum sufficient to raise its total valuation to $9,000,000; this was its estimate of the amounts spent by tenants, in excess of their allowances, to complete their store interiors. There was evidence from only two tenants, and even as to those there was no evidence to show what parts of the excess amounts were spent on actual improvements to the real estate and what parts were spent on personal property, such as cash registers, carpets, draperies, etc. This excess valuation of $694,696.75 was certainly based upon no competent and substantial evidence and constituted a mere guess on the part of the Commission. We are required to remand the case for another hearing. At that hearing (if an actual cost approach is still used in evidence and separate consideration given to such additions) there should be evidence or some agreement as to amounts spent by all the tenants for those improvements which constituted additions to the real estate, such as electric wiring, pipes, ceilings, plastering, steel installation, permanent flooring, etc. We have noted the disapproval of the actual cost method, used alone. The alternative would be to fix a valuation by some recognized method upon the improvements *as a whole* as of January 1, 1971, including those made by the tenants. The assessor claimed to have done so, and Mr. Duck affirmatively testified to a fair market value, probably omitting in certain phases a portion of the improvements made by the tenants. We do not presume to suggest the method. The question of which party took depreciation on those additions which constituted a part of the real estate is not decisive, nor is the question of who paid for them. Our statute, Section 137.010, requires that in taxing real estate, fixtures be taxed; some of these improvements were of an even more permanent nature than fixtures. Certainly a large part of these improvements were taxable as real estate regardless of the allowances. See 51 Am.Jur. Taxation, Section 418, pp. 439–440; also Trabue Pittman Corp. v. County of Los Angeles, 29 Cal.2d 385, 175 P.2d 512 (1946), and Interstate Lien Corp. v. Schmidt, 180 Misc. 910, 44 N.Y.S.2d 709 (1943) cited by respondent. The provisions of the leases with the tenants are not before us and they could not

be controlling if they were. Property permanently affixed to the real estate, or which has become a part thereof, generally speaking, becomes taxable to the owner as a part of the real estate, at least until its removal (if permitted as between the lessor and lessee). By analogy see Leawood National Bank v. City National Bank & Trust Co., 474 S.W.2d 641 (Mo.App.1971); Stockton v. Tester, 273 S.W.2d 783 (Mo. App.1954).

We revert now briefly to the matter of the principal valuation. Kahler, supra, seems to hold that the valuation may not be based solely upon construction costs. We find it difficult to tell whether the Commission relied upon the construction costs as such, or whether it adopted that figure as the replacement cost of the building, taking no depreciation, and without the tenants' additional improvements. On another hearing the finding should be more specific and, if replacement cost is to be relied on, Hermel should have further evidence, especially since the construction contract was obviously executed and the costs fixed as early as 1969. In any event, the Commission must arrive at the "true value" or fair market value as of January 1, 1971, by whatever method is followed.

There were two cases before the Commission, one involving the land, the other the improvements. They were consolidated. This opinion covers both. The order and judgment of the Circuit Court is reversed and set aside and the cause is remanded to that Court with directions to enter an order in conformity with this opinion, and to remand the cause to the State Tax Commission for reconsideration in the light of this opinion and judgment.

PER CURIAM:

The foregoing opinion by HENRY I. EAGER, Special Commissioner, is adopted as the opinion of the Court.

All of the Judges concur.